ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8|1|06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PHOENIX FOUR, INC.,

                       Plaintiff,

               - against-

STRATEGIC RESOURCES CORPORATION,
PAUL SCHACK, CHRISTIAN M. VAN PELT,
JAMES J. HOPKINS III, ROBERT H. ARNOLD,
R.H. ARNOLD & CO. INCORPORATED,
JOEL G. SHAPIRO, and JGS ADVISORS LLC,

                       Defendants.
------------------------------------------------------------------X

No. 05 CIV. 4837 (HB)

OPINION & ORDER

**Hon. HAROLD BAER, JR., District Judge:**

On March 13, 2006, Plaintiff Phoenix Four, Inc. ("Phoenix") filed an amended complaint against defendants Strategic Resources Corporation ("SRC"), Paul Schack, Christian M. Van Pelt, James J. Hopkins III (collectively with SRC, the "SRC Defendants"), Robert H. Arnold, and R.H. Arnold & Company, Inc.[1] alleging several common law claims. The amended complaint pled 28 U.S.C. Section 1332(a) as the sole basis for subject matter jurisdiction. Presently before the Court is the SRC Defendants' motion to dismiss the amended complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the reasons set forth below, the SRC Defendants' motion is GRANTED.

## I. BACKGROUND

### A. Procedural History

Phoenix commenced this action on May 19, 2005, bringing claims under the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the common law. The original complaint asserted subject matter jurisdiction under 28 U.S.C. Section 1331 (federal question) and 28 U.S.C Section 1332(a) (diversity). On February 21, 2006, I granted the defendants' motion, made pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), to dismiss the federal causes of action as time barred. I denied the motion as to most of the common law claims, however, and provided Phoenix leave to amend the complaint. See Phoenix Four, Inc. v.

---

[1] Phoenix voluntarily dismissed all claims against Joel G. Shapiro and JGS Advisors LLC on August 18, 2005. See Dckt. 26.

Strategic Resources Corp., No. 05 Civ. 4837, 2006 WL 399396, at *12 (S.D.N.Y. Feb. 21, 2006).

Phoenix filed its amended complaint on March 13, 2006, asserting common law claims for, among others, breach of fiduciary duty, fraud, and negligent misrepresentation. Phoenix pled subject matter jurisdiction solely under 28 U.S.C. 1332(a). On March 30, 2006, the defendants moved to partially dismiss the amended complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. On April 27, 2006, the defendants also moved for summary judgment. These two motions were held in abeyance following receipt of this motion to dismiss.

On May 23, 2006, the SRC Defendants alerted the Court—somewhat belatedly, to say the least—that Phoenix may not have subject matter jurisdiction. As a consequence, on May 30, 2006, I amended the pre-trial scheduling order and adjourned the trial to January 2007, so as to enable the parties to brief the jurisdictional issue. I heard oral argument on the SRC Defendants' motion to dismiss for lack of subject matter jurisdiction on July 13, 2006. On July 20, 2006, at the Court's request, Phoenix submitted additional deposition testimony to which it had referred at oral argument.

### B.     Jurisdictional History

Phoenix is an investment company incorporated in The Bahamas in 1993 and licensed as a mutual fund under Bahamian law in 1997. Am. Compl. ¶¶ 1, 9, 20. Phoenix's Memorandum of Association and Amended Memorandum of Association list the company's registered office as being in Nassau, The Bahamas. See 06/11/2006 Decl. of Paul Hellmers, Director of Phoenix, in Opp'n to 12(b)(1) Mot. to Dismiss Am. Compl. ("Hellmers Decl.") ¶ 3. It was established to invest primarily in real estate ventures in the United States. Am. Compl. ¶ 2. SRC, a New York corporation, was Phoenix's investment adviser, manager, asset manager, and administrator. Id. ¶¶ 10, 28-29, 63. Schack, Van Pelt, and Hopkins were founders, shareholders, officers, and directors of SRC. Id. ¶¶ 11-13. All three also served on Phoenix's Board of Directors: Schack and Van Pelt from 1994 through April 21, 2004, and Hopkins from April through August 2004. Id. Schack is a citizen of the State of New York and resides in New York City. Id. ¶ 11. Van Pelt is a citizen of Belgium and a permanent resident of the United States who resides in New Jersey. See Decl. of Christian M. Van Pelt in Supp. of 12(b)(1) Mot. to Dismiss Am. Compl. ("Van Pelt Decl.") ¶¶ 2-3. Hopkins is a citizen of the State of New Jersey. Am. Compl. ¶ 13.

Phoenix alleges that Schack, Van Pelt, and Hopkins engaged in self-dealing when they

2

sat on the Phoenix Board, and that they and SRC made fraudulent misrepresentations to Phoenix. Id. ¶¶ 5, 217-31. As a result of this and other misconduct by the SRC Defendants, Phoenix faced a liquidity problem and was forced to suspend the sale and redemption of its shares in February 2003. Id. ¶ 7. In April 2004, after Schack and Van Pelt resigned from the Phoenix Board, a new Board was installed. Id. ¶ 8. The members of the new Board were Percy R. Pyne IV, Paul Hellmers, Richard Schneider, Richard Dawids, Philippe Verhoeven, Etienne Beeckmans, and Hopkins. See 06/09/2006 Decl. of Percy R. Pyne IV in Opp'n to 12(b)(1) Mot. to Dismiss Am. Compl. ("Pyne Decl.") ¶ 4. All currently remain on the Board except for Hopkins who, as noted above, ceased to be a Phoenix director after August 2004. See id. Pyne and Hellmers have been residents of the State of Connecticut since April 22, 2004. See id. ¶ 2; Hellmers Decl. ¶ 2. Schneider is a citizen of Luxembourg who resides partly in Luxembourg and partly in The Bahamas. See Hellmers Decl. ¶ 4. Dawids, Verhoeven, and Beeckmans all reside in Belgium. See id. Dawids is a citizen of Denmark; Verhoeven and Beeckmans are citizens of Belgium. See id.

Beginning in or about September 2004, the officers of Phoenix were: Schneider (President), Beeckmans (Vice President), Shirl Gaskins (Secretary), and Khalila Dorset (Assistant Secretary). See id. ¶ 8. Gaskins was Phoenix's sole employee and, until her resignation in November 2004, worked and lived in The Bahamas. See id. Dorset is a Bahamian attorney and citizen who resides in The Bahamas. See id. After Gaskins resigned, Dorset became Secretary of Phoenix. See id. Pyne and Hellmers became officers of Phoenix in September 2005. See id. ¶ 9.

Prior to March 2003, Phoenix made investments, issued shares, redeemed shares, and calculated its Net Asset Value ("NAV"). See Pyne Decl. ¶ 12. Phoenix suspended the issuance and redemption of shares, as well as the calculation of its NAV, in February 2003. After that time, because Phoenix had no funds to make new investments, its Board did not make or consider any new investments, and no new subsidiaries were established. See id. The only expenses Phoenix incurred after February 2003 were directed to the compensation of directors, compensation of attorneys and experts who worked for Phoenix in The Bahamas, on this litigation, and on an arbitration with Phoenix's outside accountant and auditor BDO, compensation of accountants who prepared the company's financial statements, and any payments to shareholders. See id. ¶ 11.

3

Prior to January 2005, Phoenix maintained an office in Nassau, The Bahamas. See Hellmers Decl. ¶ 10. After that date, however, Phoenix's Bahamian office was repossessed for non-payment of rent. See id. Phoenix's official address then became c/o Fidelity Merchant Bank and Trust Limited, 51 Frederick Street, Nassau, The Bahamas. See id. In late 2004 or January 2005, Phoenix's files and records were moved to the Fidelity offices. See id. In accordance with Bahamian law, Fidelity had maintained Phoenix's shareholder records and files, and these remained at Fidelity in May 2005. See id. ¶ 11.

Phoenix has several subsidiaries incorporated in Delaware, New Jersey, and The Bahamas. See Pyne Decl. ¶ 11. Some of these subsidiaries directly or indirectly own or have owned real estate located in Massachusetts, New York, Maryland, and New Jersey. See id.

## C. Jurisdictional Facts Asserted By Phoenix

Subsequent to the installation of the new Board, the Phoenix Board met face to face on six occasions. See Pyne Decl. ¶ 6. Three of those meetings were held in Brussels and three in New York. See id. In the same period, the Board also held fourteen meetings via conference or teleconference calls. See id. On all but one of these occasions, Schneider, Dawids, Verhoeven, and Beeckmans participated from Europe—generally from Brussels or Luxembourg. See id. Pyne generally participated from New York, but on four occasions he called in from other locations in the United States and Europe. See id. Hellmers participated in seven calls from New York, and in six calls from other locations in the United States or Europe. See Hellmers Decl. ¶ 7.

All formal meetings of Phoenix's shareholders since January 1, 2004, have taken place in Brussels. See Pyne Decl. ¶ 5. Some shareholders met as members of an informal "Steering Committee" in late 2003 and early 2004. See id. All meetings of the Steering Committee have occurred in Europe, generally in Brussels. See id.

Phoenix's financial records had been kept by SRC in New York. See Pyne Decl. ¶ 9. Sometime in the Fall of 2004, SRC delivered those records to RESIG[2] in New York City and/or to the offices of Pyne's company, The Pyne Companies, at 40 Wall Street, New York City. See id.; Pyne Companies Corporate Brochure, Ex. H to Shah Decl. I. At the end of December 2004, the active financial data and records were sent to the Pyne Company of Colorado LLC in Denver, Colorado, whose staff took over responsibility for the financial affairs of Phoenix and its

---

[2] Pyne's Declaration does not define what the acronym "RESIG" stands for.

4

subsidiaries. See Pyne Decl. ¶ 9. All of Phoenix's financial records were maintained and payments processed from Denver through and after May 19, 2005. See id. Apart from these financial records, many of the documents that SRC turned over to the Board of Directors in 2004 were kept at 30 Wall Street, New York City, through May 19, 2005. See id. ¶ 10. Basically, the records that remained in New York concerned Phoenix's current and former subsidiaries and investments. See id. These records were kept in New York because personnel of the Pyne Companies in New York managed Phoenix's subsidiaries, and Phoenix anticipated that these records would be required in litigation with SRC in New York. See id. The offices of Phoenix's counsel in this litigation are located at 30 Wall Street. See id.

The Board's activities related to Phoenix between April 22, 2004, and May 19, 2005, the date of the complaint in this matter, included reports to shareholders as to the operations of Phoenix's subsidiaries and the financial prospects of the company as a whole, the regulation of the company's legal affairs, the negotiation with Valued Redeems (shareholders who had redeemed their shares prior to the suspension of redemptions) over their claims and demands for payment, the receipt of reports on the operations of Phoenix's subsidiaries, and the determination of whether to sell assets. See id. ¶ 12. The reports to shareholders and negotiations with Valued Redeems occurred primarily in Europe through the Board members resident there. See id.; 03/22/2006 Dep. Tr. of Philippe Verhoeven at 114:16-115:6. The regulation of legal affairs occurred primarily in The Bahamas and Colorado, through counsel retained in those places. See Pyne Decl. ¶ 12. The direction of Phoenix's relations with and reports to shareholders, and the decisions whether to sell assets occurred or were made where the individual directors lived and worked. See id. Of the two directors based in the United States, Hellmers primarily worked from his home in Connecticut and, since April 22, 2004, spent no more than 20% of his time on matters for Phoenix and its subsidiaries in New York. See Hellmers Decl. ¶ 13, 18. In addition, he traveled to Europe on Phoenix matters about once every other month. See id. ¶ 15. Pyne worked in New York, and estimated that, between April 2004 and May 19, 2005, 80% of his work for Phoenix concerned the subsidiaries. See Pyne Decl. ¶ 14; 07/13/2006 Tr. of Oral Argument on Mot. to Dismiss for Lack of Subject Matter Jurisdiction ("Oral Argument Tr.") at 19:20-21. He traveled to Europe—Belgium, Luxembourg, and Switzerland—about once every six weeks to meet with shareholders and the European directors. See Pyne Decl. ¶ 12.

5

**D. Jurisdictional Facts Asserted By The SRC Defendants**

On April 22, 2004, Pyne was appointed Chairman of the Phoenix Board and assumed operational control of the company. See 03/22/2006 Dep. Tr. of Philippe Verhoeven ("Verhoeven Dep."), Ex. 3 to 06/28/2006 Decl. of Sanjit Shah in Further Supp. of 12(b)(1) Mot. to Dismiss Am. Compl. ("Shah Decl. II"), at 147:4-18. The Board decided that Pyne was the appropriate person to manage Phoenix on a day-to-day basis in part because he was experienced in the real estate market, and much of Phoenix's assets were in its real estate in the United States. See id. at 147:19-148:4.

In September 2004, when SRC ceased to provide services to the Fund, Phoenix announced to its shareholders that Pyne and Hellmers would form a team to fill the void left by SRC and "assume all responsibility for the daily operations of the fund." 06/28/2005 Phoenix IV Annual General Meeting Brussels, p.16 "New Management Agreement and Compensation Proposal" ("Compensation Proposal"), Ex. B to 05/31/2006 Decl. of Sanjit Shah in Supp. of 12(b)(1) Mot. to Dismiss Am. Compl. ("Shah Decl. I"). The management team consisted of Pyne, Hellmers, Edward G. Anderson III ("Anderson"), and Jay B. Fischoff ("Fischoff"). See "Summary of Resolutions Relating to Incentive Compensation Structure," Ex. 2 to Shah Decl. II. Both Anderson and Fischoff were employees of the Pyne Companies; Anderson was based in Colorado, and Fischoff in New York. See Pyne Decl. ¶ 11; 03/24/2006 Dep. Tr. of Percy R. Pyne IV ("Pyne Dep. I"), Ex. G to Shah Decl. I, at 19:1-3.

Pyne and Hellmers were the only two Phoenix directors designated "executive directors," and thus were responsible for managing the company. See 02/22/2006 Dep. Tr. of Paul Hellmers ("Hellmers Dep."), Ex. F to Shah Decl. I, at 23:13-25:21, 34:2-6. Their duties involved strategic direction of the Fund, including the formulation of a financial strategy for Phoenix's assets, and management of the cash flow. See id., 25:3-21. As executive directors, Pyne and Hellmers were each paid $360,000 a year, 50% of which was deferred until the Fund made distributions to certain shareholders. See id. at 26:25-28:1. In contrast, other directors each earned fees of $60,000 a year. See id. at 34:2-20. In addition, Pyne, Hellmers, and the management team were entitled to 90% of an incentive compensation plan presented to shareholders on June 28, 2005, while the other directors would receive the remaining 10%. See id. at 27:7-9, 34:7-35:5; Compensation Proposal, Ex. B to Shah Decl. I.

Verhoeven, one of Phoenix's European directors, has testified that Pyne, Hellmers, and

6

Pyne's employees in New York were responsible for stabilizing Phoenix's assets, i.e., they had reduced or renegotiated expenses on, and reduced the debts of, the assets. See Verhoeven Dep., Ex. K to Shah Decl. I, at 120:4-121:9. He credited "[a]ll the people . . . in New York who are working for the fund" with having stabilized the Fund within one year and saved it from bankruptcy. Id. at 127:10-128:5. Pyne himself testified that he and the Pyne Companies had recovered between $30 and $40 million for Phoenix investors through the recovery or restoration of the equity value of its real estate assets. See 04/06/2006 Dep. Tr. of Percy R. Pyne IV ("Pyne Dep. II"), Ex. 1 to Shah Decl. II, at 115:7-116:20.

Verhoeven also testified that Pyne and Hellmers "in New York" led the negotiations over the potential sale of a Phoenix asset known as South Port. Verhoeven Dep., Ex. K to Shah Decl I, at 234:7-14. He averred that he considered it part of their duties to negotiate potential deals with third parties and inform the Board about the progress of those negotiations. See id. at 234:18-235:5.

Pyne's testimony tells us that, at the time the complaint was filed, Phoenix did not employ a management company, fund manager, administrator, investment advisor, or any employees. See Pyne Dep. 1, Ex. G to Shah Decl. 1, at 39:13-40:17. Instead, Phoenix had arranged to reimburse Pyne's company for the efforts of Pyne employees who worked on Phoenix matters. See id. at 40:16-41:3. The Pyne Companies employed six people in New York City, including Pyne himself, but excluding Hellmers. See id at 19:1-7. Pyne estimates that Phoenix presently owes his company about $650,000 for employee salaries, rental of office space, and "communications." Id. 41:5-22.

The SRC Defendants have submitted documentary evidence that, as early as May 2004, third parties communicated with the Phoenix Board at the headquarters of Pyne's company at 40 Wall Street in New York City. See Letter from Encore Management, S.A., Asset Manager, Ex. A to Shah Decl. I. In November 2004, Pyne requested that Phoenix's bank statements be sent to the 40 Wall Street address. See 11/12/2004 E-mail from Pyne to Diana Danin at HSBC, Ex. C to Shah Decl. I, at SRC-HD0419375. On December 2, 2004, Pyne and Hellmers co-authored a letter to Phoenix's shareholders stating that "the books and records of the Fund are under our direct control," and that "hundreds of file boxes are being delivered to the Fund's asset manager's new offices at 30 Wall Street in New York City." 12/02/2004 Letter to Shareholders, Ex. 1 to Shah Decl. I, at 1. On April 12, 2005, the Board decided that a project to update

7

Phoenix's shareholder records would be managed out of New York. See 04/12/2005 Board Minutes, Ex. 8 to Shah Decl. II.

## II. LEGAL STANDARD

### A. Standard on Motion to Dismiss Pursuant to Rule 12(b)(1)

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, " a facially sufficient complaint may be dismissed for lack of subject matter jurisdiction if the asserted basis for jurisdiction is not sufficient." Frisone v. Pepsico, Inc., 369 F. Supp. 2d 464, 469 (S.D.N.Y. 2005) (citations omitted). The party asserting subject matter jurisdiction has the burden of proving, by a preponderance of the evidence, that such jurisdiction exists. See Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005). When deciding a Rule 12(b)(1) motion, the court may resolve disputed jurisdictional facts by referring to evidence outside the pleadings. Zappia Middle E. Constr., Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000). Accordingly, the court may base its decision "on the basis of affidavits or other evidence, and no presumptive truthfulness attaches to the complaint's jurisdictional allegations." Frisone, 369 F. Supp. 2d at 469-70 (citations and internal quotation marks omitted).

### B. Diversity Jurisdiction

28 U.S.C. Section 1332(a)(2) grants federal district courts "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of a State and citizens or subjects of a foreign state." Id. (West 2006). It has long been settled that diversity jurisdiction under Section 1332 requires "complete diversity" between all plaintiffs and defendants in an action. Exxon Mobil Corp. v. Allapattah Servs., Inc., 125 S. Ct. 2611, 2617 (2005). Therefore, in a case with multiple defendants, if a single defendant is from the same state as the plaintiff, the district court loses diversity jurisdiction over the entire action. See id. Further, in a case where foreign parties are involved, diversity is destroyed where there are aliens on one side of the litigation, and citizens and aliens on the other side. Universal Licensing Corp. v. Paola del Lungo S.p.A., 293 F.3d 579, 581 (2d Cir. 2002). To determine whether diversity exists, the citizenship of the parties will be examined as of the commencement of the action. See Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570-71 (2004).

## III. DISCUSSION

The SRC Defendants challenge Phoenix's assertion of subject matter jurisdiction on two

8

grounds. First, they argue that there is no diversity here because there are aliens on both sides of the litigation. Second, they contend that Phoenix is a citizen of New York as well as of The Bahamas because its principal place of business is in New York. Consequently, diversity is destroyed because several of the defendants are citizens of New York.

### A.     Aliens on Both Sides

The SRC Defendants maintain that Van Pelt, who is a citizen of Belgium and a permanent resident of the United States, is an alien for purposes of determining diversity jurisdiction. They argue that his presence in this litigation destroys diversity because Phoenix, by virtue of its incorporation in The Bahamas, is also an alien. Phoenix responds that under a 1988 amendment to Section 1332 (the "1988 Amendment" or the "Amendment"), Van Pelt is deemed to be solely a citizen of New Jersey, where he resides. Hence, his presence poses no obstacle to diversity jurisdiction here.

The 1988 Amendment provides that, for the purposes of Section 1332, "an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled." 28 U.S.C. § 1332(a) (West 2006). Courts are divided as to whether the Amendment applies when a resident alien is in litigation with a non-resident alien. Compare Singh v. Daimler-Benz AG, 9. F.3d 303 (3d Cir. 1993) (holding that Amendment applies in such circumstances because statutory language is unambiguous) with Saadeh v. Farouki, 107 F.3d 52 (1st Cir. 1997) (holding that Amendment does not apply because literal reading of the statute would partially abrogate the rule of complete diversity and expand diversity jurisdiction contrary to legislative intent). The Second Circuit has not weighed in on this debate.

Here, it is unnecessary for me to decide this issue since, for the reasons given below, this case must be dismissed for lack of diversity on the other ground advanced by the SRC Defendants.

### B.     Phoenix's Dual Citizenship

The SRC Defendants next contend that there is no diversity here because under 28 U.S.C. Section 1332(c), Phoenix is a citizen of New York as well as of The Bahamas, and some of the defendants are citizens of New York. Phoenix disagrees that Section 1332(c) creates dual citizenship for foreign corporations, or that Phoenix's principal place of business is New York.

#### 1.     28 U.S.C. Section 1332(c)

Under 28 U.S.C. Section 1332(c)(1), "a corporation shall be deemed to be a citizen of

9

any State by which it has been incorporated and of the State where it has its principal place of business." See id. (West 2006). Like the 1988 Amendment discussed above, this provision presents a controversial issue: namely, whether foreign as well as domestic corporations fall within its reach.

The Supreme Court has not ruled on this issue. See JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88, 98 n.3 (2002). Nor have I found anything in the cases that the parties cite to suggest that this Circuit has taken a position on this issue. Phoenix cites to Clarkson Co., Ltd. v. Shaheen, 544 F.2d 624 (2d Cir. 1976). There, the Second Circuit merely observed in dicta in a footnote that alien corporations were "probably deemed" to be citizens exclusively of foreign states for diversity purposes. See id. at 628 n.5. The SRC Defendants urge this Court to consider Universal Licensing Corp. v. Paola del Lungo S.p.A., 293 F.3d 579 (2d Cir. 2002); Franceskin v. Credit Suisse, 214 F.3d 253 (2d Cir. 2000); and Bailey v. Grand Trunk Lines New England, 805 F.2d 1097 (2d Cir. 1986). Universal and Franceskin refrain from expressing any opinion on the application of Section 1332(c). Rather, in both cases, the Second Circuit assumed that "even if" Section 1332(c) reached foreign corporations, diversity would still be defeated if another alien were an adverse party. See Universal Licensing Corp., 293 F.3d at 581; Franceskin, 214 F.3d at 258. Finally, in Bailey, this Circuit held that the citizenship of a foreign corporation must be determined in accordance with Section 1332(c), but it did so only for purposes of the Foreign Sovereign Immunities Act, not diversity jurisdiction. See id., 805 F.2d at 1100.

Those Circuits that have decided this issue, however, agree that Section 1332(c) applies to alien corporations. See JPMorgan Chase Bank, 536 U.S. at 98 n.3. These Circuits concur with the analysis of the former Fifth Circuit in Jerguson v. Blue Dot Investment, Inc., 659 F.2d 31 (5th Cir. 1981). See Danjaq, S.A. v. Pathe Communications Corp., 979 F.2d 772, 775 (9th Cir. 1992); Vareka Invs., N.V. v. Am. Inv. Props., Inc., 724 F.2d 907, 909-10 (11th Cir. 1984). As the Jerguson court explained, the underlying purpose of diversity jurisdiction "is to provide a separate forum for out-of-State citizens against the prejudices of local courts and local juries." Id., 659 F.2d at 33. It observed that Congress' intent in adopting Section 1332(c) was to eradicate the perceived abuse of an essentially local enterprise availing itself of a federal forum simply because it had been incorporated in another state. See id. The Fifth Circuit reasoned that extending Section 1332(c) to alien corporations would effectuate that Congressional purpose.

10

See id.

Prior to Jerguson, the majority of courts in this District appear to have adhered to the contrary holding in Eisenberg v. Commercial Union Assurance Co., 189 F. Supp. 500 (S.D.N.Y. 1960).[3] See Jerguson, 659 F.2d at 34 (collecting cases). In the last two decades, however, the weight of authority in this District has shifted in favor of Jerguson. See, e.g., Eugenia VI Venture Holdings, Ltd. v. Surinder Chabra, 419 F. Supp. 2d 502, 505-06 (S.D.N.Y. 2005) (Chin, J.); Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc., No. 99 Civ. 9404, 2000 WL 1224814, at *2 (S.D.N.Y. Aug. 29, 2000) (Stein, J.); Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC, 75 F. Supp. 2d 279, 281 (S.D.N.Y. 1999) (Motley, J.); One Hundred Pearl Ltd. v. Vantage Secs., Inc., No. 93 Civ. 7214, 1997 WL 401670, at *4 (S.D.N.Y. July 16, 1997) (Leisure, J.); Philan Ins. Ltd. v. Frank B. Hall & Co., Inc., 786 F. Supp. 345, 348 n.3 (S.D.N.Y. 1992) (Patterson, J.); Korff v. Bank Julius Baer & Co., Ltd., No. 88 Civ. 4569, 1990 WL 67771, at *2 (S.D.N.Y. May 14, 1990) (Lowe, J.); Petroleum & Energy Intelligence Weekly, Inc. v. Liscom, 762 F. Supp 530, 534 (S.D.N.Y. 1989) (Walker, J.); Clifford Corp., N.V. v. Ingber, 713 F. Supp. 575, 577 (S.D.N.Y. 1989) (Walker, J.); Schneider v. Bahama Cruise Line, Inc., 664 F. Supp. 80, 82 (S.D.N.Y. 1987) (Carter, J.).

I find the reasoning of Jerguson and the decisions by my colleagues in this District to be persuasive, and join them in holding that Section 1332(c) extends to alien corporations. Accordingly, Phoenix would be a citizen of New York as well as of The Bahamas if its principal place of business were New York.

### 2.  **Principal Place of Business**

In this Circuit, two tests are commonly employed to determine a corporation's principal place of business. See Augienello v. Fed. Deposit Ins. Corp., 310 F. Supp. 2d 582, 590 (S.D.N.Y. 2004). The "nerve center" test defines the principal place of business as "the nerve center from which [a corporation] radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the

---

[3] The Eisenberg court relied on a literal reading of the statute. It noted that Section 1332 differentiated between States of the United States and foreign states by the use of a capital "S" when referring to the former. See id., 189 F. Supp. at 502. Because Section 1332(c) capitalized the "S" in the word "States," the court concluded that the subdivision applied only to corporations that were incorporated in a State of the United States. See id.

11

corporate objective." Scot Typewriter Co. v. Underwood Corp., 170 F. Supp. 862, 865 (S.D.N.Y. 1959). Under this test, courts "focus on those factors that identify the place where the corporation's overall policy originates." Augienello, 310 F. Supp. 2d at 590 (citing R.G. Barry Corp. v. Mushroom Makers, Inc., 612 F.2d 651, 655 (2d Cir. 1979)). The other test has been labeled the "place of operations" or "locus of operations" test. There, the effort is to identify the place in which a corporation conducts its principal operations. See R.G. Barry Corp., 612 F.2d at 655. Courts generally apply the "nerve center" test when a corporation's operations are geographically widespread, and the "locus of operations" test when a corporation is centralized. See Augienello, 310 F. Supp. 2d at 590-91.

Regardless of which is the more appropriate test, and they are much the same, the case law makes it clear that judges should not be "straightjacketed by the formal requirements of each test," but rather should adapt the tests to the facts of each case. Refco Props., Inc. v. Trump, No. 94 Civ. 2124, 1995 WL 412423, at *8 (S.D.N.Y. July 12, 1995). A flexible approach is appropriate where the facts do not fall neatly within the parameters of either the "nerve center" or the "locus of operations" analysis. For example, in Refco and Danbury Bowlrama Corp. v. RCA Corp., courts in this District applied the nerve center test to centralized corporations, because they found that the corporations conducted few physical or service oriented operations, but rather were mainly concerned with the management of their own affairs. See Refco, 1995 WL 412423, at *9; Danbury Bowlarama Corp., 414 F. Supp. 354, 357 (S.D.N.Y. 1976). Conversely, in Leve v. General Motors Corp., the court applied a "locus of operations" analysis to a far-flung corporation, because its policies were made in one state, but operational control exercised in another state. See id., 246 F. Supp. 761, 764 (S.D.N.Y. 1965). Leve explained that where these functions were split between different states, courts have found the center of operational control to be the corporation's principal place of business. See id. at 764 (collecting cases). Leve followed the analysis in Kelly v. United States Steel Corp. There, the corporation's final policies were set in New York, but basic policy decisions were made in Pennsylvania where the manufacturing, mining, transportation, and general operations of the corporation were conducted. See Kelly, 284 F.2d 850, 854 (3d Cir. 1960). The Kelly court held that the latter activities were more indicative of where the corporation's business was centered than "the occasional meeting of policy-making Directors." Id.

The facts here are analogous to those in Leve and Kelly. At the commencement of this

12

action—the critical time for assessing citizenship for purposes of diversity—operational control of and policy-making for Phoenix were exercised in different states. The devising of a financial strategy and negotiations with third parties over the disposition of assets, key activities towards Phoenix's corporate intent of recouping value for its shareholders,[4] were entrusted to the two executive directors, Pyne and Hellmers. Pyne was based in New York, and of the time Hellmers devoted to Phoenix, 20% was spent in New York. Together, therefore, Pyne and Hellmers spent more time working in New York on Phoenix business than anywhere else, making New York the gravitational center of executive control. Indeed, Verhoeven, one of Phoenix's European directors, perceived Hellmers to be part of the management team "in New York." Further, the SRC Defendants have produced documentary evidence, uncontradicted by Phoenix, that New York was the center of Phoenix's communications with third parties and shareholders. Phoenix's final policies, on the other hand, were set by the Board. According to Phoenix, more than half the Board meetings must be deemed to have occurred in Europe because the majority of Board meetings were conducted via conference or teleconference calls, and the directors primarily called in from where they lived and worked. As Leve and Kelly teach, however, the location of Board meetings weighs less than the essential functions of the corporation where these activities occur in separate states. That argument carries particular force here where more Board meetings took place over telephone lines than in an ascertainable geographic location. Accordingly, New York was the center of executive control where the day to day business of Phoenix was conducted and thus Phoenix's principal place of business.

Phoenix's attempts to minimize its contacts with New York are unavailing. It points out that its financial records were managed in Colorado, and payments processed there. These financial functions were collateral to the corporation's main function of restoring value to its investors, however, and hence of little significance in determining its principal place of business. Phoenix also argues that 80% of Pyne's efforts were related to Phoenix's subsidiaries, and these efforts may not be imputed to Phoenix to ascertain its citizenship. There is no need, however, to factor the 80% of Pyne's efforts devoted to subsidiaries into the assessment of Phoenix's principal place of business. Regardless of where else Pyne expended his energies, it is

---

[4] The evidence Phoenix submitted in support of this motion downplays this intent. It is abundantly apparent from Verhoeven's deposition testimony, however, that financial recovery was Phoenix's chief purpose at the time this suit was filed.

13

the 20% Pyne dedicated to Phoenix that is material. It is apparent that 20% of Pyne's efforts was sufficient to formulate and direct Phoenix's financial strategy, and that these efforts were instrumental in achieving Phoenix's overall corporate purpose.

Equally unavailing is Phoenix's contention that its principal place of business is "either Europe or the Bahamas."[5] In support of the first location, Phoenix argues that negotiations with the Valued Redeems—shareholders who exercised their right to redeem their shares before redemptions were suspended—played an important part in keeping the Fund out of bankruptcy, and that activity happened in Europe. It also highlights the Brussels location of formal shareholder meetings and the reports to shareholders delivered in Europe. Phoenix's own compensation structure, however, bears compelling testimony that the Board itself placed far less value on the activities in Europe than in New York. For their day-to-day direction of the Fund, Pyne and Hellmers were each entitled to annual compensation six times that paid to each non-executive director. Moreover, they and the management team were allocated 90% of Phoenix's incentive compensation plan. The reports to shareholders simply tracked the role played in New York. Similarly, Pyne and Hellmers traveled to Europe to deliver progress reports on the operations that they directed from New York. As to the location of shareholder meetings, Kelly cautions that shareholders may choose to meet elsewhere than the corporation's principal place of business. See id., 284 F.2d at 852.

Finally, Phoenix draws attention to its incorporation in The Bahamas. Although its registered office and official address were in Nassau, Phoenix maintained no presence there after January 2005 except for record storage at Fidelity's offices and retention of counsel to help it regulate its legal affairs to comply with Bahamian corporations law. This paucity of contacts falls far short of the showing required to establish The Bahamas as Phoenix's principal place of business. Indeed, the legislative intent behind Section 1332(c) was to prevent just such an assertion of citizenship based on little more than a charter of incorporation in a foreign state.

Phoenix's claim to a federal forum based on diversity must therefore be denied for failure to carry its requisite burden, i.e. to establish, by a preponderance of the evidence, that its

---

[5] Phoenix's argument that its principal place of business is either one of two places is untenable. Setting aside the question of whether "Europe" qualifies as a state under Section 1332(c), it is well settled that a corporation may have only one worldwide principal place of business. See Bailey, 805 F.2d at 1101.

14

principal place of business is in a state other than New York.[6] Because I find that Phoenix's principal place of business is New York, and it must therefore be considered a New York citizen, there is no diversity of citizenship with the New York defendants, and this action must be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## IV. CONCLUSION

The SRC Defendants' motion to dismiss the amended complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is granted and the amended complaint dismissed. This Court has no jurisdiction to decide the pending motion to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), or the summary judgment motion. The Clerk of the Court is instructed to close this and all outstanding motions, and remove this case from my docket.

**IT IS SO ORDERED.**
New York, New York
August ___, 2006

_____
U.S.D.J.

---

[6] Phoenix argues that its burden is met if it refutes the SRC Defendants' position that Phoenix's principal place of business is New York. While that has not happened here, it is important to note that in fact such a characterization of the burden that attaches to the party that asserts subject matter jurisdiction is incorrect. Phoenix may not simply rely on refuting the SRC Defendants' showing that its principal place of business is New York, but must affirmatively demonstrate that it is in some other state. See Delalande, Inc. v. Fine, 545 F. Supp. 268, 273-74 (S.D.N.Y. 1982).

15